*23418*

AMOUNT $ *150.00*
SUMMONS ISSUED *yes*
LOCAL RULE 4.1 *yes*
WAIVER OF FORM _____
MCF ISSUED _____
BY DPTY CLK _SS_
DATE _6-29-00_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MEDTRONIC, INC.,                      )
                                      )
      Plaintiff,                   )
                                      )
    vs.                             )
                                      )
THEREX LIMITED PARTNERSHIP, and       )
                                      )
ARROW-THEREX CORPORATION,             )
    General Partner of Therex Limited  )
    Partnership,                     )
                                      )
      Defendants.                  )
_____ )

Case No.: **00 CV 1 1 2 7 1 PBS**

**COMPLAINT FOR DECLARATORY JUDGMENT**

(Demand for Jury Included)

Plaintiff, Medtronic, Inc., by its attorneys, brings this action against Defendants Therex Limited Partnership and Arrow-Therex Corporation for a judgment declaring that the claims of United States Patent No. 4,978,338 ("the `338 patent") are not infringed and/or are invalid and states as follows:

## PARTIES

1. Plaintiff Medtronic, Inc. ("Medtronic") is a corporation organized under the laws of the State of Minnesota and has a principal place of business at 7000 Central Avenue N.E., Minneapolis, Minnesota 55432.

2. On information and belief, Therex Limited Partnership ("Therex LP") is a partnership organized under the laws of the State of Delaware, having a principal place of business at 1600 Providence Highway, Walpole, Massachusetts, and is qualified to do business in Massachusetts, having registered under Mass. Gen. L. ch. 109, §49.





3.     On information and belief, Arrow-Therex Corporation ("Arrow-Therex") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 1600 Providence Highway, Walpole, Massachusetts, is qualified to do business in Massachusetts, having registered under Mass. Gen. L. ch. 181, §4, and is the General Partner of Therex LP.  On information and belief, Arrow-Therex, as General Partner of Therex LP, controls the decisions and activities of Therex LP, including any actions Therex LP has taken and may take with respect to the issue of alleged patent infringement set forth below, and is therefore a necessary party to this action.

## JURISDICTION AND VENUE

4.     Based on paragraphs 1-3 above, paragraphs 8-19 below,  and the facts set forth herein, this action arises under the Acts of Congress relating to patents, 35 U.S.C. §§ 1 *et seq.*, and for a declaratory judgment and further relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This Court has subject matter jurisdiction over this complaint in accordance with the provisions of 28 U.S.C. §§ 1331 and 1338 (a).

5.     On information and belief, Therex LP and Arrow-Therex, directly, by an agent or both, have transacted business within the Commonwealth, from which the below-described causes of action arise.

6.     Based on paragraphs 1-5 above, paragraphs 8-19 below, and the facts set forth herein, this Court has personal jurisdiction over Therex LP and Arrow-Therex by virtue of Mass. Gen. L. ch. 223A, §§1-3 and federal law.

7.      Venue is proper under 28 U.S.C. §§ 1391(b, c).

## FACTUAL BACKGROUND

8.      Medtronic incorporates by reference paragraphs 1-7 of this Complaint as though fully and completely set forth herein.

9.      On information and belief, Therex LP is the owner, by assignment, of United States Patent No. 4,978,338 ("the `338 patent"), issued on December 18, 1990 in the names of Gerald S. Melsky and Frank R. Prosl, and originally assigned to Therex Corporation (a Massachusetts corporation now dissolved), which assigned the `338 patent to Therex LP.  A copy of the `338 patent is attached hereto as Exhibit A.

10.     The `338 patent describes and claims, *inter alia*, an implantable pump for delivering medication to a site within a patient, including two ports, one for filling a reservoir with medication for metered release to the site, and the other for direct release to the site.

11.     Therex LP owns European Patent No. 0 612 535 ("Therex's European Patent") which claims priority of the United States patent application from which the `338 patent issued, and which includes claimed subject matter similar to that of the `338 patent.

12.     Subsidiaries and affiliates of Medtronic manufacture and/or market Medtronic's IsoMed® implantable drug infusion pump ("the IsoMed Pump") in Europe.

13.     As reported in an October 9, 1997 article of <u>Clinica</u> (attached hereto as Exhibit B), on information and belief, Arrow Corporation, on information and belief the parent corporation of Arrow-Therex, "complained to Medtronic that the new German pump violates its existing patent on the system in both Germany and the US" and that "Arrow is prepared to sue for patent infringement." The <u>Clinica</u> article quotes Marlin Miller, then CEO and President of Arrow, as saying such suing "could slow the introduction of the product to Arrow's advantage."

14.     Therex LP filed an infringement suit ("the German suit") in Germany against Medtronic's German subsidiary (Medtronic GmbH) on August 17, 1998, alleging the IsoMed Pump infringed Therex's European Patent.  In accordance with the German judicial procedure related to patent cases, the court hearing the German suit had jurisdiction to consider only the issue of infringement and, therefore, could not consider whether or not Therex's European Patent was valid.  On July 22, 1999, the German court ruled that the IsoMed Pump infringed Therex's European Patent, without evaluating the validity of the patent.

15.     Purporting to represent Therex LP, Prof. Willem A. Hoyng, in a March 21, 2000 letter (attached hereto as Exhibit C) to Medtronic's subsidiary in The Netherlands (Medtronic B.V.), explained a continuing series of actions Therex LP has taken and would take in the future in Europe to halt Medtronic's manufacture and sale of the IsoMed Pump in Europe. In the March 21 letter, Prof. Hoyng stated Therex LP's desire to obtain a court injunction to halt Medtronic's manufacture of the IsoMed Pump in The Netherlands, and reiterated Therex LP's contention that the IsoMed Pump infringes Therex's European Patent.

16.     Counsel for Therex LP in the United States, Ken George, in January and February 2000 communications regarding a possible arrangement between Therex LP and Medtronic involving Therex LP's patents and the IsoMed Pump, stated that Therex LP has patents around the world, and indicated that such arrangement would require a seven-figure payment (*i.e.*, at least $1 million) and a double-digit royalty (*i.e.*, at least 10%).  On information and belief, such figures are greater than those customary in licensing agreements in the medical device industry for comparable markets.

17.     Medtronic, through its affiliates and subsidiaries, currently have other adversarial proceedings pending with Therex LP over the alleged infringement of Therex's European Patent by the IsoMed Pump.  Therex LP has alleged that the IsoMed Pump infringes Therex's European Patent in response to a petition brought on February 2, 2000 in Belgium by Medtronic, in which Medtronic claims that Therex's European Patent is not infringed by the IsoMed Pump and is otherwise invalid.  In addition, Medtronic and Therex LP are involved in an appeal by Medtronic of the decision in the German suit; an action brought in The Netherlands on June 6, 2000 by Medtronic seeking a determination that Therex's European patent is invalid; and an appeal by Medtronic contesting a European Patent Office decision finding Therex's European Patent, in an amended form, to be valid.

18.     Medtronic has applied for, and the United States Food and Drug Administration ("FDA") is currently considering, approval for marketing of the IsoMed Pump in the United States.  On information and belief, the FDA is currently scheduled to decide whether

to grant marketing approval for the IsoMed Pump in July 2000. Medtronic expects the FDA to grant approval at that time. Upon approval by the FDA, Medtronic intends to offer for sale and to sell the IsoMed Pump in the United States. Medtronic has made substantial investments in designing and manufacturing the IsoMed Pump, in seeking FDA approval for the IsoMed Pump, and in preparing marketing, sales, and distribution means to provide the IsoMed Pump to United States customers. In preparation for such sales in the United States, Medtronic has imported multiple IsoMed Pumps into the United States.

19.     Based upon all of the above facts, Medtronic has a reasonable apprehension that it will be sued in the United States by Therex LP for alleged infringement of the `338 patent by the IsoMed Pump, such that an actual controversy now exists between the parties hereto with respect to the validity of Therex's `338 patent and with respect to Medtronic's alleged infringement of this patent.

## COUNT I - DECLARATORY JUDGMENT OF NON-INFRINGEMENT

20.     Medtronic incorporates by reference paragraphs 1-19 of this Complaint as though fully and completely set forth herein.

21.     Medtronic's IsoMed Pump does not infringe any valid and enforceable claim of the `338 patent. Therefore, Medtronic is entitled to a declaratory judgment that Medtronic does not infringe the `338 patent.

### COUNT II - DECLARATORY JUDGMENT OF INVALIDITY

22.     Medtronic incorporates by reference paragraphs 1-22 of this Complaint as though fully and completely set forth herein.


23.     Therex's `338 patent, and each and every claim thereof, is invalid for failure to meet the requirements of one or more of 35 U.S.C. §§ 102, 103, and/or 112.  Therefore, Medtronic is entitled to a declaratory judgment that the `338 patent is invalid.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Medtronic, Inc. prays that this Court:

A.      Declare United States Patent No. 4,978,338 has not been infringed by Medtronic,

Inc., and would not be infringed by the making, using, selling, offering to sell, or importing in

the United States of the Medtronic IsoMed Pump;

B.      Declare all claims of United States Patent No. 4,978,338 are invalid;

C.      Award Medtronic, Inc. such other and further relief as this Court may deem just

and proper.

## JURY DEMAND

Plaintiff Medtronic, Inc. demands a jury trial on all issues triable to a jury in this

matter.

Dated: _6/28/00_____

James J. Marcellino
Massachusetts Bar No. 318840
**McDERMOTT, WILL & EMERY**
28 State Street
Boston, Massachusetts 64106
(617) 535-4000

Of counsel:

Raphael V. Lupo
Donna M. Tanguay
Dawn L. Palmer
Natalia V. Blinkova
**McDERMOTT, WILL & EMERY**
600 13th Street, N.W.
Washington, D.C.
20005-3096
(202) 756-8000

Attorneys for Plaintiff
**MEDTRONIC, INC.**

Exhibit A

# United States Patent [19]

## Melsky et al.

[11]   **Patent Number:**     **4,978,338**

[45]   **Date of Patent:**   Dec. 18, 1990

[54]   **IMPLANTABLE INFUSION APPARATUS**

[75]   Inventors: **Gerald S. Melsky**, Lexington; **Frank R. Prosl**, Duxbury, both of Mass.

[73]   Assignee: **Therex Corp.**, Walpole, Mass.

[21]   Appl. No.: **184,244**

[22]   Filed: **Jun. 20, 1988**

[51]   Int. Cl.⁵ ............................................... A61M 5/00
[52]   U.S. Cl. ...................................... 604/93; 604/132; 604/86
[58]   Field of Search .................. 604/93, 175, 131, 132, 604/140, 141, 86, 83, 82, 43

[56]                  **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,552,441 | 1/1971 | Luhleich . |
| 3,730,170 | 5/1973 | Michael . |
| 3,731,681 | 5/1973 | Blackshear et al. . |
| 4,193,397 | 3/1980 | Tucker . |
| 4,258,711 | 3/1981 | Tucker . |
| 4,496,343 | 1/1985 | Prosl . |
| 4,525,165 | 6/1985 | Fischell . |
| 4,692,146 | 9/1987 | Hilger .................................. 604/175 |

*Primary Examiner*—C. Fred Rosenbaum
*Assistant Examiner*—Denise W. DeFranco
*Attorney, Agent, or Firm*—Nutter, McClennen & Fish

[57]                  **ABSTRACT**

Implantable infusion apparatus includes a housing with an inlet passage extending into the housing at a pronounced promontory on the housing wall. The passage has an outer end at the top of the promontory and an inner end defined by a needle stop positioned inside the housing. Self-sealing septa mounted in the passage at selected spacings from the needle stop divide the passage into a plurality of aligned inlet ports each of which has its own fluid outlet. One of the outlets leads to a pumpable infusate reservoir having an outlet conduit connected to a catheter that extends outside the housing; another leads directly to the outlet conduit so that while a first fluid is being pumped from the reservoir to the catheter, a second fluid can be introduced into the other inlet port for mixing with the first fluid flowing to the catheter. Several different infusate flow configurations are also disclosed.

**45 Claims, 2 Drawing Sheets**







FIG.4



FIG.5

FIG.6

4,978,338

**1**

## IMPLANTABLE INFUSION APPARATUS

This invention relates to implantable infusion appara-
tus. It relates more particularly to an implantable self-
powered infusate pump which is capable of dispensing a
measured dose of infusate to a patient over the long
term and which is refillable and rechargeable by trancu-
taneous injection.

### BACKGROUND OF THE INVENTION

Implantable infusion apparatus of the general type
with which we are concerned has been in use for a
number of years to treat diabetes, Alzheimer's disease,
certain types of cancer and other chronic diseases. Basi-
cally, the apparatus includes a housing which contains a
collapsible infusate reservoir. An inlet port through a
wall of the housing communicates with the interior of
the reservoir and that passage is closed by a needle-
penetrable septum mounted in the housing wall. An
outlet passage from the reservoir containing a flow
restrictor extends to the housing exterior where it is
connected to the proximal end of a flexible catheter.

In use, the apparatus is implanted at a selected loca-
tion in the body so that the inlet septum is situated di-
rectly underneath the patient's skin and the distal end of
the catheter is positioned at a selected infusion site.
Infusate is delivered to the infusion site by forcing that
fluid from the apparatus reservoir through the catheter
to the infusion site. The flow restrictor in the reservoir
outlet determines the flow rate from the reservoir.
When the infusate reservoir becomes empty, it may be
refilled by injecting fresh infusate through the appara-
tus' inlet septum. As noted previously, the inlet is acces-
sible readily by transcutaneous injection using a hypo-
dermic needle or cannula.

In the infusion apparatus of interest here, infusate is
expelled from the reservoir to the infusion site by col-
lapsing that reservoir. That collapsing force is provided
by a two-phase fluid which is situated in a fluid-tight
space outside the reservoir. The fluid is both a liquid
and a vapor at physiological temperatures, e.g. 98.6° F.,
and it exerts a positive and constant pressure over the
full volume change of the reservoir. On the other hand,
when the infusate reservoir is expanded upon being
refilled with fresh infusate during the refilling process
described above, the two-phase fluid is compressed
with a portion of it reverting to its liquid phase thereby
recharging that vapor pressure power source. The con-
struction and operation of implantable infusate apparatus
and pumps of this general type are described in detail,
for example, in U.S. Pat. Nos. 3,731,681 and 3,951,147
and in the article entitled "Liquid Dispensers" by B. M.
Wright in the *Quarterly Bulletin and Review*, Vol. 16,
No. 3, Sept. 1, 1964 and in the *Journal of Physiology*, Vol.
177, (1965). See also the September 1964 Masters Thesis
of P. D. W. Soden to be found at Victoria University of
Manchester, England.

While the prior art pumps operate satisfactorily, they
are relatively expensive to manufacture and to assem-
ble. Also, they are relatively large. For example, one
such pump of which we are aware is in the order of 3.3
inches in diameter, one inch thick and weighs about 220
grams. When that prior prosthesis is implanted in a
patient's body, the patient is obviously well aware of its
presence and may, as a result, suffer considerable dis-
comfort and anxiety.

**2**

Some known implantable pumps are difficult to refill
in that it is difficult to locate their septa in order to insert
needles into their inlet ports to refill or otherwise ser-
vice the apparatus. This may be due to a combination of
factors, including the use of an inlet septum having a
small surface area and the inability to distinguish the
septum from the remainder of the implanted apparatus.
Even if the spot on the patient's skin directly above the
septum is marked by a tattoo when the pump is im-
planted initially, over the course of time, the relative
positions of the mark and the underlying septum may
change due to patient movements and weight changes.
In those known pumps whose catheters exit the housing
close to the septum, a mispositioned needle can actually
damage the pump by puncturing the rubber catheter.
Such damage would, of course, necessitate surgical
removal of the pump.

In this connection, we should mention that when
refilling an implanted pump, the normal procedure is to
insert a hollow needle into the pump's inlet port and
allow any remaining volume of the original infusate in
the reservoir served by that inlet port to back-flow out
through the needle. Then, a fixed volume of the fresh
infusate is injected into the reservoir through the nee-
dle, after which the needle is withdrawn. It is apparent,
therefore, that each emptying and refilling procedure is
a time-consuming process that involves skin penetra-
tions and requires the patient to remain still while the
needle fixed to his body introduces and/or removes
fluid from the infusion device implanted in his body. In
many instances, this procedure is performed in a clinic
or physician's office or on a hospital out-patient basis.
Therefore, each office visit for servicing the pump can
be quite expensive.

Also, some implantable apparatus such as those de-
scribed in U.S. Pat. Nos. 4,193,397 and 4,258,711 have
two-pumping chambers or reservoirs enabling them to
dispense two different infusate concentrations or infu-
sates. The two pumping chambers are purged and re-
filled independently by way of separate inlet ports posi-
tioned at different locations on the pump housing, each
port having its own needle-penetrable septum located
underneath the patient's skin.

Another known implantable infusate dispenser dis-
closed in U.S. Pat. No. 4,496,343 for example, has, in-
stead of a second pumping chamber, an injection portal
on the housing wall. This portal is basically a small
chamber with an outlet leading to the catheter and an
inlet port closed by a self-sealing septum located under-
neath the patient's skin. Infusate injected transcutane-
ously into the portal flows directly to the catheter and,
therefore, to the infusion site. In other words, the injec-
tion process provides the pumping force to deliver the
infusate. Such a device can also be used for blood with-
drawal.

It is apparent that the proper servicing and utilization
of such dual port devices may require many more skin
penetrations than are needed to service a pump with a
single inlet port. As noted above, once the device is
implanted, the positions of the inlet ports and their septa
are more or less fixed with respect to the overlying skin
area of the patient. Therefore, over the period of im-
plantation, the patient's skin may be punctured many
times at the two septa locations resulting in inconve-
nience and pain for the patient.

Another disadvantage of the prior plural-port im-
plantable pumps is their propensity for being refilled
with the wrong fluid. More particularly, after the de-

4,978,338

3

vice is implanted, as noted above, its position may change somewhat relative to a fixed spot on the patient's skin surface. Also, the septa are quite small and indistinguishable. Therefore, when refilling or purging the implanted device, it is quite easy for a nurse to insert a needle into the wrong inlet port if she is not very careful. In the case of a two chamber insulin pump, for example, this could result in the basal reservoir of the pump being refilled with bolus infusate and the bolus reservoir being charged with lower concentration basal infusate, or it could result in one reservoir of that pump being emptied or filled twice and the other reservoir not being serviced at all.

It would be desirable, therefore, if the number and duration of the transcutaneous injections required to access or to service an implanted pump could be minimized, along with the potential for servicing errors. This would not only reduce the risk of infection to the patient, it would also reduce the incidence of epidermal problems associated with implanted refillable infusate pumps of this type, and it would certainly reduce the physical and emotional stress on a patient required to wear such an implanted device.

## SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide improved implantable, refillable, self-powered infusion apparatus.

Another object of the invention is to provide such apparatus which is smaller and more compact than a conventional implantable apparatus of this general type.

A further object of the invention is to provide an implantable, refillable infusion pump which is relatively lightweight.

Still another object is to provide such a pump which is relatively easy to manufacture and to assemble as compared to existing devices of this general type.

Yet another object of the invention is to provide an implantable, refillable infusion pump whose refill port or ports can be located easily after the pump is implanted in the patient's body.

A further object of the invention is to provide an implantable, refillable, dual-port infusion device which minimizes the number and duration of skin penetrations required to properly service the device by transcutaneous injection into the device.

Another object of the invention is to provide an implantable, refillable, dual-port infusion apparatus whose inlet ports can be accessed simultaneously with a single penetration of the patient's skin.

Still another object is to provide a dual-port, refillable infusion device which prevents a surgeon or physician from accessing the wrong inlet port when servicing the device after it is implanted.

Still another object is to provide such an infusion device which has sealing redundancy to prevent leakage of infusate within the patient.

Another object of the invention is to provide a device of the type which has a smoothly rounded outer surface which minimizes dead spaces in the implantation area so that infection can occur.

Still another object is to provide an implantable infusion device which has a minimum number of separate tubes and plumbing joints.

Other objects will be, in part, be obvious and will, in part, appear hereinafter.

The invention accordingly comprises the features of construction, combination of elements and arrangement

4

of parts which will be exemplified in the following detailed description, and the scope of the invention will be indicated in the claims.

In general, our infusion apparatus operates on the same basic principles as the implantable infusion pump described in the aforementioned U.S. Pat. No. 3,731,681. Our apparatus can also deliver at least two different infusates to the same infusion site or to different sites in the body of the patient in which the apparatus is implanted. In this, it is similar to the device described in the above-mentioned U.S. Pat. No. 4,496,343. However, our apparatus is constructed in such a way as to materially reduce the overall size and weight of the apparatus as compared to those prior implantable pumps, and additionally, to minimize discomfort and danger to the patient in which the device is implanted by reducing the number of skin penetrations required to service the apparatus after it is implanted, by reducing the incidence of errors in accessing the apparatus and by minimizing patient trauma caused generally by the implantation of the device.

Our infusion apparatus is generally cylindrical having the overall shape of a large pocketwatch. All of the major components and fluid pathways of the apparatus are incorporated in or mounted to a single rigid discoid header or manifold structure. Upper and lower shells mounted to the top and bottom of the header structure are shaped to define internal spaces which enclose various apparatus parts and to give the apparatus a smooth, uninterrupted, gently contoured exterior shape or profile.

A collapsible bellows capsule is positioned in the space between the header and the lower shell. One end of the bellows capsule is open and specially secured in an annular groove present in the underside of the header to facilitate assembly of the capsule as will be described in more detail later. The opposite end of the bellows capsule is closed so that the capsule separates the space between the header and the lower shell into two fluid-tight variable volume compartments. One of these compartments, say, the one inside the capsule, constitutes an infusate reservoir; the other compartment, i.e. the one between the capsule and the lower shell normally contains a two-phase fluid which, at physiological temperatures, produces sufficient vapor pressure to collapse the bellows capsule as described in the above-identified prior art.

When the bellows capsule is collapsed by the driving fluid, infusate inside the capsule flows along a fluid pathway provided in the header to the periphery of the apparatus. That fluid pathway includes an outlet filter recessed into the underside of the header and a flow restrictor to maintain a constant fluid flow from the capsule. Provision is made at the periphery of the apparatus for connecting the proximal end of a flexible catheter so that the catheter lumen is in fluid communication with the fluid pathway in the header. The connection is removed from the surface of the device that faces the skin and is arranged so that the catheter extends tangentially from the apparatus shell so that the catheter will not be punctured when the apparatus is being serviced.

The bellows capsule is located eccentric to the outer diameter of the header thereby providing room on one side of the periphery of the device where the catheter may be connected while keeping the header diameter as small as possible. The catheter may be of any selected length so that when the apparatus is implanted in a patient, it will conduct infusate from the apparatus to a

5

4,978,338

6

selected infusion site in the patient's body. As will be described in greater detail later, the fluid pathways in the header that conduct infusate from the bellows capsule through the filter and flow restrictor to the catheter can all be formed by simple drilling and/or surface milling operations so that precise manufacturing and defect-free assembly of the apparatus are facilitated.

The present apparatus also includes at least two inlet or access ports by which two different infusates or liquids may be introduced into the apparatus after it is implanted. One of these inlet ports leads to the interior of the bellows capsule, the other inlet port is connected by a passage in the apparatus header to the outlet from the bellows capsule that leads to the catheter. As with prior implantable pumps of the dual-port type, each of the inlet ports is closed by a needle-penetrable, self-sealing septum, which when the pump is implanted in the body, is accessible by transcutaneous injection. Thus, one infusate can be injected into the one inlet port to refill the bellows capsule and to recharge the pump and a second or different infusate may be injected into the other inlet port from which it will flow directly to the catheter so as to supplement the infusate flow thereto from the bellows capsule.

However, whereas prior dual-access devices of this general type have their two inlet ports located at two different locations on the pump housing, in the present apparatus, the two ports are stacked one on top of the other at a pronounced promontory or mesa that projects up at the center of the apparatus. The two ports are isolated from one another and from the outside environment by a pair of septa spaced one on top of the other in a passage that extends down through the header, the inner end of the passage being closed by a permeable needle stop. Thus, the passage segment between the one inlet port, which leads to the interior of the bellows capsule and the passage segment between the two septa constitutes the other inlet port which leads directly to the apparatus outlet and the catheter. Thus, when the apparatus is implanted, both of its inlet ports are located at different levels underneath the very same area of the patient's skin.

It would be appreciated that the locating of the common entrance to the inlet ports at a raised rounded promontory or mesa on the apparatus facilitates servicing same. This is because, after implantation, the physician or surgeon can readily locate that promontory and distinguish it from the apparatus housing generally by feeling or pressing against the patient's skin area overlying the general vicinity of the apparatus. When he finds that promontory, it can serve as a target for the needle or cannula. That, coupled with the fact that septa being penetrated have surface areas about four times larger than those on conventional devices of this type means that the servicing of the apparatus can be carried out expeditiously and with minimum discomfort and inconvenience to the patient.

The apparatus is accessed by different needles or cannulae or, more preferably, by a single needle unit which has two parallel fluid paths or lumens. The lumens have separate inlets which permit fluid to be introduced into or withdrawn from each lumen independently. The lumens also have separate outlets which are located at different elevations on the needle unit, as measured from the unit's tip. Moreover, the spacing of the outlets is related to the spacing of the stacked inlet ports of the infusion apparatus so that when the apparatus is implanted and the needle unit is punctured through the patient's skin into the apparatus through the latter's septa until its tip contacts the needle stop, the outlet of each needle unit lumen will automatically be in fluid communication only with the corresponding inlet port of the implanted prosthesis.

Thus, with a single needle penetration, both ports of the implanted device can be accessed independently at the same time. For example, while the infusate reservoir constituted by the bellows capsule is being emptied or filled by way of the needle unit lumen communicating with the one inlet port, a bolus dose of infusate can be infused into the patient via the other lumen which communicates with the other inlet port. It should be understood, however, that although our apparatus allows simultaneous access to both inlet ports of the implanted device, one does not necessarily have to perform the flow operations simultaneously. The point is that our arrangement reduces the number of skin punctures necessary to service an implanted infusion pump or other such device of the dual-port type. It also reduces the length of time that the patient has to be inconvenienced by needles or cannulae penetrating his epidermis. This should, of course, make the wearing of such an implanted device much more bearable to the patient.

It is also important to note that since the fluid paths through the needle unit are keyed or matched to the inlet ports of the implanted apparatus by the corresponding placements of the respective needle outlets and apparatus inlet ports, there is no possibility of a needle accessing the wrong internal port or chamber of the implanted apparatus.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the nature and objects of the invention, reference should be had to the following detailed description, taken in connection with the accompanying drawings, in which:

FIG. 1 is a plan view with parts broken away of implantable infusion apparatus incorporating our invention;

FIG. 2 is a vertical sectional view on a much larger scale showing the FIG. 1 apparatus in greater detail;

FIG. 3 is a sectional view taken along line 3—3 of FIG. 2;

FIG. 4 is a view similar to FIG. 1 of apparatus incorporating our invention which dispenses infusate to two different infusion sites in the body;

FIG. 5 is a diagrammatic view of the FIG. 4 apparatus; and

FIG. 6 is a similar view of an apparatus embodiment having a dual lumen outlet catheter.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Drawing FIG. 1 shows our infusion apparatus generally at 10. The overall size and shape of apparatus 10 are determined by a rigid discoid header or manifold 12, an upper annular shell 14 and a lower cup-like shell 16 (FIG. 2). The shells are secured at their edges to the periphery of the header to form a housing or enclosure which has a more or less continuous, smoothly-contoured outer surface devoid of sharp edges and corners. The header and shells are all made of stainless steel, titanium or other strong biocompatible material. Typically, apparatus 10 has an overall diameter of about three inches and a thickness of about one-half inch except at a central raised mesa or promontory 18 where its

7

4,978,338

8

thickness is about one inch. The weight of apparatus 10 is only in the order of 120 grams. Actually, apparatus 10 is about one-half as heavy as, and occupies about one-half the volume of, conventional infusion apparatus of this type.

Infusate is introduced into apparatus 10 through an opening 22 at the promontory 18. It leaves the apparatus 10 by way of a flexible catheter 24, the proximal end 24a of which is connected to header 12 at the very edge of the apparatus. In use, apparatus 10 is implanted at a suitable location in the patient's body, e.g. in a subcutaneous pocket in the patient's abdominal wall and it is positioned so that opening 22 is located directly underneath the patient's skin. Small wire loops 26 are welded to the periphery of the header at spaced-apart locations around the apparatus. These can be sutured to body tissue at the implantation site to anchor the apparatus. The distal end 24b of catheter 24 is also sutured in place at a selected infusion site, e.g. a blood vessel or a ventricle space, whose location depends upon the particular patient's physical problem so that the infusate introduced into opening 22 will be conducted via catheter 24 only to that selected site.

Referring now to FIG. 2, the lower edge of header 12 has a circumferential notch 28 that forms a seat for the edge of the lower shell 16 and those two parts are welded all around at 32 so that the header and lower shell together define a fluid-tight space in which is positioned a collapsible bellows capsule 36 preferably of the welded type. The lower end of capsule 36 is closed by an end wall 36a. The upper end of the capsule is open and connected to the underside of header 12.

To effect this connection, a special annular bracket or plate 38 is welded all around at 39 to the inner edge of the uppermost diaphragm 36b of capsule 36 prior to mounting the capsule to the header. The bracket or plate 38 has a slightly larger diameter than that of capsule 36 and its edge margin is bent down to form a peripheral flange 38a that surrounds the uppermost convolutions of the bellows capsule.

The open end of capsule 36, including the bracket 38, seats in a circular groove or channel 42 formed in the underside of header 12 adjacent to the outer edge thereof.

The groove 42 is formed eccentric to the circular perimeter of manifold or header 12 so that capsule 42 is displaced away from the catheter to provide room in the housing for the catheter connection to be described. This keeps the header diameter quite small so that the overall volume of the device is minimized.

Preferably, bracket 38 is shaped so as to space its inner edge, where the weld connection 39 to the bellows is made, from the bottom of the groove 42 to minimize stresses on the weld seam. Groove 42 is deep enough so that when the capsule is fully collapsed, its convolutions nest in groove 42 to a degree that positions the bellows end wall 36a above the lower edge of the bracket flange 38a. This clearance allows a weld bead 44 to be made between that flange edge and the outer edge of the header groove 42 all around the flange without any likelihood of the heat from the welding operation damaging bellows capsule 36. Thus, manufacture of apparatus 10 is facilitated because the bellows capsule can be completely fabricated and attached to bracket 38 outside the apparatus and then the open end 65 of that assembly can be welded to the header reliably all around the bellows capsule at 44 without adversely affecting the bellows capsule. The nesting of the bel-

lows capsule in the header groove 42 also minimizes the compressed volume of the bellows which, in turn, minimizes the bellows extension or stroke required to expel a given volume of infusate from the capsule 36, and thus, the overall thickness of the apparatus.

In the apparatus 10 specifically illustrated herein, the region inside capsule 36 constitutes a reservoir 46 for a first infusate $I_1$. The space or compartment 47 between capsule 36 and shell 16 contains a two-phase fluid F, such as a Freon which is in a two phase state at physiological temperatures with a suitable vapor pressure. Fluid F is introduced into compartment 47 by means of a small tube 48 (FIG. 1) whose lower end is connected to the upper end of a vertical passage 52 in header 12 which leads to that compartment. After that space is charged with fluid F, the upper end of tube 48 is crimped and sealed by a weld 48a. It is important to note that when the apparatus is fully assembled, tube 48 is completely covered and protected by the upper shell 14. However, even if a leak should occur in the tube, the escaping fluid F will be confined in the space under shell 14 and will not be released into the patient.

Still referring to FIG. 2, a shallow generally cylindrical recess 58 is formed in the underside of header 12 at the righthand side thereof, as viewed in that figure. Press fit in that recess is a disk-like filter member 62 consisting of, for example, a 0.2 micron membrane filter.

A small vertical passage 74 is formed in header 12 directly opposite recess 58 for receiving one end of a glass capillary tube 76. The tube end may be anchored and sealed in passage 74 by suitable means such as an epoxy cement. Tube 76 constitutes a fluid flow restrictor and to obtain the necessary degree of restriction for a flow rate of 1 ml/day, for example, the tube must be relatively long. Therefore, the tube is wrapped around a raised header section 12a at the center of the header. The opposite end of tube 76 is received and sealed into a vertical passage 78 extending down through header 12 at a location spaced from passage 74 therein.

A radial groove 82 inscribed in the undersurface of header 12 intercepts the lower end of passage 78. The radially inner end of groove 82 joins the lower end of a vertical passage 83 that extends down from the top of header section 12a. The radially outer end of groove 82, on the other hand, intercepts the lower end of a vertical hole 84 that extends to the upper surface of header 12. Groove 82 is covered by a thin discoid plate 85 seated in a shallow recess 86 provided in the underside of header 12. Thus, a straight fluid conduit (e.g. 0.01 × 0.05 × 1.25 inch) exists between passage 83 and hole 84 that functions as a mixing chamber 87 as will be described in detail later.

A similar radial groove 88 is formed in the upper surface of header 12. Groove 88 leads from the upper end of hole 84 to a second hole 94 that extends vertically from the header upper surface part way down through a thickened marginal sector of header 12 where it intercepts a much larger diameter orthogonal passage 96. As best seen in FIG. 3, passage 96 extends horizontally following a chord line through the header that leads into a slightly smaller diameter collinear passage 98, with each passage exiting the header at spaced-apart locations around the perimeter thereof.

Groove 88 is covered by a thin plate 102 which is similar to plate 85 and which seats in a shallow recess 104 in the upper surface of the header. Both plates are held in place by epoxy cement, welding or other suitable means. Thus, a fluid flowing from tube 76 into

4,978,338

9

mixing chamber 87 is conducted via hole 84, groove 88 and hole 94 to passage 96.

Still referring to FIG. 3, passage 96 is arranged to snugly receive a cylindrical plug 108 made of the same material as header 12, the outer end of the plug being flush with the outer surface of the header. Plug 108 is formed with a reduced diameter waist segment 108a which, when the plug has bottomed in its passage 96 as shown in FIG. 3, is situated directly opposite the hole 94 that intercepts passage 96. Plug 108 has an axial passage 110 that extends from the inner end of the plug at least to the plug segment 108a where it joins a short branch passage 110a leading to the surface of plug segment 108a. Further, that plug inner end is counterbored at 110b, the counterbore having the same diameter as passage 96. Both the passage and the counterbore snugly receive the proximal end 24a of catheter 24 which, along with plug 108, is secured and sealed in place by a cement or other suitable means. Thus, the fluid flowing into hole 94 as described above is conducted via plug passages 110 and 110a into the lumen of catheter 24.

It is noteworthy that the catheter 24 exits apparatus 10 well below the rounded edge of the periphery of the upper shell 14 and more or less tangentially. This ensures that there are no sharp bends in the catheter where it leaves the apparatus that could obstruct fluid flow or project into tissue at the implantation site in the patient's body. The catheter is also positioned well away from the upper surface of the apparatus that faces the patient's skin area after the apparatus is implanted. Consequently, there is little likelihood of the catheter being pinched off by tissue ingrowth or being punctured or damaged by an errant needle ostensibly being aimed at opening 22 in order to service the apparatus.

Referring again to FIG. 2, as stated previously, apparatus 10 has a central promontory 18 at the top of the apparatus. This promontory is formed by two header sections and the raised central portion of shell 14. One header section is the aforementioned integral raised section 12a at the center of the header 12. The other is a separate header section 12b that sits on top of section 12a. A relatively large diameter vertical bore or passage 122 is provided in header section 12a for snugly seating a cup-shaped needle stop 124. Bore 122 does not extend to the underside of header 12. However, small holes 126 do pass through the bottom wall of bore 122 to the header undersurface inside capsule 36. Needle stop 124 may be made of metal or, more preferably, of a suitable rigid plastic which does not interact with the infusate in apparatus 10 and which is of a hardness to stop a needle or cannula inserted into passage 122 without unduly damaging the tip of the needle or cannula. The bottom wall 124a of the needle stop is shaped to leave an annular clearance space 128 between the needle stop and holes 126. Also, that wall is provided with a circular array of tiny holes 132 to conduct infusate from passage 122 and the inside of the needle stop to the clearance space 128, thence it will flow through holes 126 into the bellows capsule 36.

Header section 12a also has a counterbore 122a that extends down from the top of that section collinearly with passage 122. Seated in the counterbore is a discoid, needle-penetrable, self-sealing septum 134 made of medical grade rubber or the like. The septum 134 seats snugly in counterbore 122a so that its upper surface is more or less flush with the upper surface of section 12a. Thus, the space inside passage 122 and needle stop 124

10

below septum 134 constitutes an inlet port 136 for bellows capsule 36, i.e. for infusate reservoir 46 inside the capsule.

The header section 12b that seats on section 12a is a generally cylindrical annular member 138 having an axial bore or passage 142 extending from the underside of that member almost to the top thereof. A smaller diameter bore extends down from the top of member 138 to form the opening 22 at the top of the apparatus that was described at the outset. Typically, that opening is about one-half inch in diameter. A second discoid septum 144 similar to septum 134 is seated in passage 142 so that it completely fills opening 22. Passage 142 is counterbored from below at 146 to receive an annular spacer 148 which engages under septum 144 and holds the septum in place in member 138. Spacer 148 may be made of the same plastic material as needle stop 124 and for reasons to become apparent shortly, a radial hole or passage 149 is provided through that spacer.

As noted previously, header section 12b is designed to seat on header section 12a. Accordingly, it is provided with a shoulder 138a and a cylindrical skirt 138b that extends down and seats in a circumferential notch 152 at the top of section 12a. When the two sections are stacked as shown, the spacer 148 separates the two septa 134 and 144 so that a short, generally cylindrical space exists between the two septa which constitutes the second inlet port 154 of apparatus 10. As shown in FIG. 2, inlet port 154 is located directly over inlet port 136 and both ports are accessible through the single opening 22 at the top of the apparatus.

Also as seen from FIG. 2, the underside of the spacer shoulder 138a is flared so as to leave an annular clearance space 156 between the shoulder and the top of header section 12a which space intercepts both the radial hole 149 in spacer 148 and the passage 83 that extends down through header section 12a to the mixing chamber 87. Accordingly, infusate introduced through opening 22 into inlet port 154 is free to flow directly through passage 83 into mixing chamber 87 where it can mix with the infusate from reservoir 46 that enters that chamber by way of capillary tube 76.

After header section 12b is secured to section 12a by epoxy cement, welding or other suitable means, the upper shell 14 of the apparatus is engaged over the top of the header so that its inner edge seats in a circumferential notch 162 at the top of header section 12b and so that its outer edge rests in a circumferential groove 164 at the upper edge of the header periphery. When that shell is secured in place by welding, epoxy cement or the like, the shell protectively encloses the capillary tube 76 and, as noted above, the fill tube 48. It also gives the upper half of apparatus 10, including its promontory 18, a smooth uninterrupted surface and a gently curved contour. In the same manner, the lower shell 16, connected at its edge to the lower edge of the header periphery by weld 32 as described above, protectively encloses bellows capsule 36 and gives the underside of apparatus 10 a similar smooth, gently curved contour so that when the apparatus is implanted, there will be minimal dead spaces created at the exterior surfaces of the apparatus in which body fluids can collect and create potential sites for infections.

The shells 14 and 16 also have a sealing function. As noted above, shell 14 provides sealing redundancy to prevent fluid F leakage through tube 48 from reaching the patient. Both shells minimize the likelihood of leakage of infusate from the apparatus into the patient after

4,978,338

11

12

the device has been implanted. That is, the shells are impervious and the welded connections of the shells to the manifold at 32, 162 and 164 are all fluid tight. Therefore, if an infusate leak should develop in the glass tube 76 or in the relatively high pressure bolus flow path, i.e. at plates 102 or header notch 152, the leakage would be contained within the space under shell 14. Similarly, a leak in bellows capsule 36 would only result in infusate flowing into the fluid tight chamber 47. In no event would there be uncontrolled fluid flow from apparatus 10 into the patient at the implantation site.

It is apparent from the above description and from the drawings that all of the vertical fluid pathways in the header 12 consist of vertical holes or passages, e.g. 72, 74, 78, 83, 96, 98 and 122, that can be formed easily and precisely by simple drilling operations. On the other hand, the horizontal pathways through the header are formed by surface grooves and recesses, e.g. 58, 82, 86, 88 and 104, which can be inscribed in the header using standard milling or surface grinding processes. Thus the design lends itself to automated manufacture of the apparatus. Indeed, for some applications, it is even possible to mold header 12 (sans section 12b), with all of its various passages and recesses in a single molding operation.

It is worthy of note also that all of the other apparatus 10 parts, such as bellows capsule 36, filter member 62, the glass capillary tube 76, and cover plates 85 and 102 are all mounted directly to the header 12 at precisely defined locations so that there is no possibility of mispositioning those parts during assembly. This helps to insure that infusion apparatus 10 can be produced in quantity on a reliable basis and with few rejects.

After apparatus 10 is implanted in the body with its opening 22 located directly under the patient's skin and the distal end 24b of catheter 24 positioned at the selected infusion site, the apparatus' infusate reservoir 46 may be filled with infusate by inserting a hollow needle (Huber tip), such as the needle shown in phantom at 168 in FIG. 2, through the patient's skin over opening 22 and through septa 144 and 134, in turn, until the needle tip bottoms against the needle stop 124. The needle is provided with an outlet opening 168a adjacent to the tip so that when the needle bottoms against the needle stop as shown in FIG. 2, the opening 168a is level with inlet port 136. Accordingly, infusate flowed into needle 168 will enter port 136 and flow into capsule 36, i.e. reservoir 46, by way of holes 132 and 126.

During the filling operation, a predetermined volume of infusate is injected under pressure into the bellows capsule. This causes the capsule to extend and, in the process to compress the two-phase fluid F in the compartment 47 inside shell 16 so that that fluid assumes its liquid phase, thereby recharging the apparatus' pumping power source in a manner well known in this art. A similar needle 168 can be used to empty fluid from bellows capsule 36 or to refill the capsule with fresh infusate. At the body temperature of the patient, the two-phase fluid F will exert sufficient vapor pressure to collapse capsule 36, thereby forcing infusate I1 from reservoir 46 through the filter member 62 and capillary tube 76 to mixing chamber 87 and thence to catheter 24 as described above.

In order to access the apparatus' second inlet port 154, a needle shown in phantom at 172 in FIG. 2 is inserted through the patient's skin and through septa 144 and 134 until the tip of that needle bottoms against the needle stop 124. Needle 172 has a side opening 172a

that is aligned with inlet port 154 when the needle is fully inserted into the apparatus as shown in FIG. 2. Thus the needle 172 can be used to inject a second infusate I2 into the inlet port 154 whence that liquid will flow directly into mixing chamber 87 where it will mix with the infusate I1 being pumped from capsule 36 so that a selected mixture of infusates I1 and I2 will be delivered to the infusion site by way of catheter 24. Since mixing chamber 87 is downstream from the flow restricting capillary tube 76 and the fluid pathway from the mixing chamber to catheter 24 is comparatively large, there is minimal possibility of the infusate I2 being conveyed back into bellows capsule 36 containing infusate I1.

In some instances, it may be desirable to provide a check valve in the flow path from the second inlet port 154. Such a valve is shown at 190 in FIG. 2. It ensures that if a leak should occur in the inner septum 134, the infusate leaking from reservoir 46 into port 154 would not be able to follow the unrestricted flow path through passages 83, 87, 88, etc. to catheter 24. Such a valve 190, e.g. a conventional spring-loaded ball valve, is arranged to open or unseat under a pressure in port 154 that is greater than the vapor pressure of the fluid in compartment 47. In other words, the valve opens only when infusate is being forceably injected into port 154 via needle 172 under a pressure appreciably greater than that exerted by the two phase fluid in compartment 47. Also, if a leak should develop in the outer septum 144, valve 190 will prevent infusate outflow from passage 83.

In actual practice, the needles 168 and 172 may be separate needles or they may be incorporated into a single needle unit having two flow paths or lumens whose outlet openings are spaced apart on the needle unit so that they open into the inlet ports 136 and 154 respectively, as described above. Thus apparatus 10 can be used, for example, to deliver a basal dose of insulin at a controlled, very low flow rate to a patient, with such basal dose being supplemented from time to time by a bolus dose of infusate injected into inlet port 154. If a dual lumen needle unit is used, liquids may be introduced into or withdrawn from inlet ports 136 and 154 independently and simultaneously after only a single puncture of the patient's skin.

Because opening 22 is quite large and is centered in the raised promontory 18 whose location can be determined readily by pressing against the patient's skin, apparatus 10 can be accessed quite quickly and with minimum discomfort to the patient in whom the apparatus is implanted. Since apparatus 10 controls such access so as to prevent each lumen of the needle unit from conducting liquid into the wrong inlet port of the apparatus, there is little likelihood of the patient being given the wrong medication.

While we have depicted and described in detail infusion apparatus having a single infusate reservoir served by an inlet port 136 and a second inlet port 154 for conducting a second infusate directly to the same infusion site, it is obvious that the principles disclosed here can be extended to other implantable infusion devices.

Our apparatus design also lends itself to the incorporation of a second outlet catheter leading from housing 12. FIGS. 4 and 5 illustrate implantable infusion apparatus 202 which has two outlet catheters 24 and 24' for conducting infusate simultaneously to two different sites in the body, e.g. an artery and a vein. Apparatus 202 is similar to apparatus 10 described above except that it has two capillary tubes 76, 76' leading from filter

4,978,338

13

recess 58 via separate flow paths 204, 204' in manifold 12 to separate vertical holes 94, 94' communicating with two separate passages 110, 110' extending from opposite ends of plug 108 to two different plug waist segments 108a, 108a'. Note that both catheters exit housing 12 tangentially and below the edge of shell 14 for the reasons discussed above.

The outlet passage 149 from the bolus inlet port 154 leads to separate vertical passages 83, 83' in header 12, containing separate check valves 190, 190'. With this arrangement, infusate will flow from capsule 36 to catheters 24 and 24'. Because arterial pressure is higher than venous pressure, the tubes 76, 76' have different high resistance flow restrictions to equalize infusate flow to the artery and vein. These regulated infusate flows may be supplemented when necessary by bolus injections into port 154. The bolus flow to the catheters may also be proportioned by downstream flow restrictors (not shown). The two check valves 190, 190' prevent unwanted blood flow from the artery to the vein due to the blood pressure differential in those blood vessels.

Apparatus 202 may also be modified easily to have a single dual lumen outlet catheter such as catheter 206 in FIG. 6. In this event, plug 108 would have parallel passages 110 and 110' connecting plug waists 108a, 108a' to the catheter lumens 206a, 206b.

Of course, if in apparatus 202 a bolus capability is needed at only one of the catheters or only one of the catheter lumens, e.g. 24, 206a, the passage 83' and its valve 190' may be eliminated.

FIG. 6 shows an implantable device 210 similar to apparatus 10 but fitted with a single dual lumen catheter 206. When the catheter is placed at a selected infusion site, i.e. a blood vessel, infusate from capsule 37 may be flowed to that vessel through catheter lumen 206a, while at the same time, blood may be withdrawn from the vessel via catheter lumen 206b by a suction needle inserted into inlet port 154. As shown in FIG. 6, the outlets of the two lumens may be spaced apart along the catheter so that the blood is withdrawn from the blood vessel upstream from the infusion site.

A similar arrangement using either a dual lumen catheter or two separate catheters may be used to infuse a patient while having the capability of monitoring the patient's blood pressure. For this, a standing column of saline or other biocompatible liquid is maintained in the fluid path from inlet port 154 to its catheter lumen and a needle-like pressure transducer is inserted into port 154 to transmit the blood pressure variations coupled to it by the liquid column to an external pressure monitor.

This invention can also be incorporated into a dual-chamber pump of the type described in the aforementioned U.S. Pat. No. 4,193,397. In this event, the inlet port 154 would be connected by fluid pathways in the header 12 to a second bellows capsule inside shell 16 constituting the reservoir for a second infusate. Indeed, implantable pumping or portal apparatus may be provided with three or more inlet ports stacked in the manner described, with those ports being accessed independently by a needle unit having a corresponding number of flow paths or lumens, each one of which opens into a different one of the inlet ports.

It will thus be seen that the objects set forth above, among those made apparent from the preceding description, are efficiently attained, and since certain changes may be made in the above constructions without departing from the scope of the invention, it is intended that all matter contained in the above descrip-

14

tion or shown in the accompanying drawings be interpreted as illustrative and not in a limiting sense.

What is claimed as new and desired to be secured by Letters Patent of the United States is:

1. Implantable infusion apparatus comprising

a hermetically sealed housing, said housing including a pronounced outwardly projecting promontory positioned at or near the center of the housing away from the periphery thereof;

a passage into said housing at said promontory;

needle stop means at the end of said passage inside said housing;

a first needle-penetrable, self-sealing septum mounted in said passage at a selected spacing from said needle stop means, said first septum being located at the outer surface of said housing at the top of said promontory;

a second septum mounted in said passage at a selected spacing from said first septum thereby to divide said passage into a first segment extending between said needle stop means and said first septum and a second aligned segment extending between said first septum and said second septum;

first and second fluid outlets from said first and second passage segments;

a pumpable infusate reservoir inside said housing in fluid communication with one of said fluid outlets, the other of said fluid outlets being in fluid communication with fluid flow means extending within said housing;

a catheter extending from the housing for conducting fluid from said apparatus to an infusion site; and

a conduit in said housing for conducting fluid from said reservoir to said catheter.

2. The apparatus defined in claim 1 wherein the other of said fluid outlets is also in fluid communication with said catheter.

3. The apparatus defined in claim 2 wherein

A. said catheter is a dual lumen catheter;

B. said conduit is in fluid communication with one lumen of said catheter; and

C. said other of said outlets conducts fluid to the other lumen of said catheter.

4. The infusion apparatus defined in claim 2 wherein said conduit from said reservoir to said catheter includes a filter and a fluid flow restrictor.

5. The infusion apparatus defined in claim 4 wherein the flow restrictor comprises a length of glass capillary tubing.

6. The infusion apparatus defined in claim 4 wherein

A. said conduit also includes a mixing chamber downstream from said flow restrictor; and

B. the other of said fluid outlets leads to said mixing chamber, so that while a first fluid is being expelled from said pumpable reservoir to said mixing chamber, a second fluid introduced into said second passage segment will flow to and be mixed in said mixing chamber with said first fluid so that a fluid mixture will be conducted to the catheter.

7. The apparatus defined in claim 7 wherein said pumpable infusate reservoir includes

A. a collapsible infusate chamber; and

B. means for collapsing the chamber to force infusate from the chamber through said conduit to said catheter.

8. The apparatus defined in claim 7 wherein the collapsing means comprise a two-phase fluid confined inside said housing adjacent to said chamber, said fluid

4,978,338

15

exerting sufficient vapor pressure at physiological temperatures to collapse said chamber.

9. The apparatus defined in claim 1 wherein said housing is generally circular and said catheter exits said housing substantially tangentially.

10. The apparatus defined in claim 1 and further including

A. a second catheter, said second catheter exiting said housing substantially tangentially and collinearly to said catheter; and

B. means for conducting fluid from the other of said fluid outlets to said second catheter.

11. The apparatus defined in claim 1 wherein said pumpable infusate reservoir comprises

A. rigid manifold means inside the housing;

B. a collapsible metal bellows capsule having an open end mounted to the manifold means, the opposite end of the capsule being closed; and

C. means in the housing for collapsing the bellows capsule.

12. The apparatus defined in claim 1 wherein

A. said passage, said outlets and at least a portion of said conduit are formed in said manifold means; and

B. said needle stop, septa and catheter are all mounted to said manifold means adjacent to the open end of said bellows capsule.

13. The apparatus defined in claim 12 wherein the open end of the bellows capsule is recessed into a circular groove with an open edge formed in said manifold means.

14. Implantable infusion apparatus comprising:

a hermetically sealed housing;

a passage into said housing;

needle stop means at the end of said passage inside said housing;

a first needle-penetrable, self-sealing septum mounted in said passage at a selected spacing from said needle stop means;

a second septum mounted in said passage at a selected spacing from said first septum thereby to divide said passage into a first segment extending between said needle stop means and said first septum and a second aligned segment extending between said first septum and said second septum;

first and second fluid outlets from said first and second passage segments;

a pumpable infusate reservoir inside said housing in fluid communication with one of said fluid outlets, said reservoir including rigid manifold means inside the housing, means defining a circular groove with an open edge in said manifold means, a collapsible metal bellows capsule having an open end recessed into said groove, the opposite end of said capsule being closed, and means for mounting said bellows open end to said manifold means, said mounting means comprising a

bracket including an annular body having an inner edge seated in said groove and a cylindrical flange having a free edge extending from the periphery of said body to the open edge of said groove,

the inner edge of said body being connected by a continuous weld to the open end of said bellows capsule and

the free edge of said flange being connected by a continuous weld to said open edge of said groove in the manifold means,

16

means in said housing for collapsing the bellows capsule;

a catheter extending from the housing for conducting fluid from said apparatus to an infusion site, and

a conduit in said housing for conducting fluid from said reservoir to said catheter, said passage, said outlets and at least a portion of said conduit being formed in said manifold means, and said needle stop, septa and catheter all being mounted to said manifold means adjacent to the open end of said bellows capsule.

15. Implantable infusion apparatus comprising:

a hermetically sealed housing;

a passage into said housing;

needle stop means at the end of said passage inside said housing;

a first needle-penetrable, self-sealing septum mounted in said passage at a selected spacing from said needle stop means;

a second septum mounted in said passage at a selected spacing from said first septum thereby to divide said passage into a first segment extending between said needle stop means and said first septum and a second aligned segment extending between said first septum and said second septum;

first and second fluid outlets from said first and second passage segments;

a pumpable infusate reservoir inside said housing in fluid communication with one of said fluid outlets, said reservoir including rigid manifold means inside the housing, means defining a circular groove with one open edge in said manifold means, a collapsible metal bellows capsule having an open end recessed into said groove, the opposite end of the capsule being closed, and means for mounting said bellows open end to said manifold means at said groove;

means in the housing for collapsing the bellows capsule;

a catheter extending from the housing for conducting fluid from said apparatus to an infusion site, said manifold means being disk-shaped and

said circular groove being located eccentric to the circular periphery of said manifold means so that the groove is displaced away from said catheter,

and a conduit in said housing for conducting fluid from said reservoir to said catheter, said passage, said outlets and at least a portion of said conduit being formed in said manifold means and said needle stop, septa and catheter all being mounted to said manifold means adjacent to the open end of said bellows capsule.

16. The apparatus defined in claim 1 and further including flow check means for preventing fluid flow from said other of said fluid outlets to said second passage segment.

17. Implantable infusion apparatus comprising:

a rigid discoid header having opposite first and second surfaces;

A circular groove in said header second surface;

a collapsible bellows capsule having a closed end and an open end;

mounting means for mounting said bellows open end to said header second surface, said mounting means including an annular bracket having a peripheral flange and radially inner and outer edges, the inner edge of said bracket being connected along its entire circular length to the capsule open end, said

**17**

bracket and said capsule open end being seated in said groove so that said flange extends adjacent to the radially outer wall of said groove and connecting means connecting said bracket outer edge along its entire circular length to said header all around said groove;

a first passage in said header extending between said header surfaces opposite the bellows capsule;

a second passage extending into said header from the periphery thereof;

a liquid conduit extending from said first passage to said second passage;

a self-sealing inlet port in said header opposite the bellows capsule, said inlet port being accessible from said header first surface, and fluid conduit means extending between said inlet port and the interior of said capsule.

18. The apparatus defined in claim 17 wherein said capsule is made of a biocompatible metal and said connections are welds.

19. The apparatus defined in claim 17 wherein said liquid conduit includes a length of flow-restricting glass tubing.

20. The apparatus defined in claim 17

A. wherein said second passage extends along a chord of said header; and

B. further including a flexible catheter having one end secured in a fluid-tight manner in said passage so that the catheter extends from the periphery of the apparatus more or less tangentially.

21. The apparatus defined in claim 17 wherein

A. said header includes a central mesa at said header first surface, said mesa having a central perpendicular axis; and

B. said inlet port is located in said mesa.

22. The apparatus defined in claim 21 further including

A. a smoothly contoured cup-like first shell mounted to said header second surface at the periphery thereof, said first shell defining with said header a first fluid-tight compartment that contains said capsule; and

B. a second smoothly contoured annular shell mounted to said header first surface, said second shell covering said second surface except at said inlet port and defining with said header a second fluid-tight compartment that overlies said first and second passages and said conduit.

23. The apparatus defined in claim 22 wherein said liquid conduit includes a length of flow restricting glass tubing wound around said mesa in said second compartment.

24. The apparatus defined in claim 23 wherein

A. said liquid conduit also includes a third passage in said header extending between said second passage and a location at said header first surface in said second compartment; and

B. said tubing is connected between said first and third passages.

25. The apparatus defined claim 22

A. wherein said second passage extends along a chord of said second shell spaced from the outer edge of said second shell and has opposite ends spaced apart on the header periphery; and

B. further including a first catheter having one end in fluid-tight communication with one end of said second passage and a second catheter having one end in fluid-tight communication with the other

**18**

end of said second passage so that said catheters extend more or less tangentially from the apparatus in opposite directions.

26. The apparatus defined in claim 22 and further including

A. a second self-sealing inlet port in said header, said second port being aligned along said axis in said mesa with said first port; and

B. liquid conducting means in said header extending from said second inlet port to said liquid conduit.

27. The apparatus defined in claim 26 wherein

A. said conduit includes a liquid flow restriction; and

B. said conducting means join said liquid conduit downstream from said flow restriction.

28. The apparatus defined in claim 27 and further including a check valve in said conducting means to prevent back flow into said second inlet port.

29. The apparatus defined in claim 26 and further including a check valve in said conducting means to prevent back flow into said second inlet port.

30. The apparatus defined in claim 22 and further including means accessible at said header second surface for flowing a two-phase fluid that vaporizes at physiological temperatures into said second compartment.

31. The apparatus defined in claim 22 and further including a plurality of suture loops attached to the outside of said header periphery at spaced apart locations therearound.

32. The apparatus defined in claim 17 and further including

A. a second self-sealing inlet port in said header, said second port being vertically aligned with said first port and accessible from the header second surface;

B. a liquid passage in said header extending from said second inlet port to the periphery of the header;

C. a first catheter having one end in fluid tight communication with said second passage at the header periphery; and

D. a second catheter having one end in fluid tight communication with said liquid passage at the header periphery.

33. The apparatus defined in claim 32 and further including a standing column of a biocompatible liquid filling said second inlet port, said liquid passage and said second catheter for transmitting pressure pulses from the opposite end of said catheter to said second inlet port for sensing by a needle-like pressure transducer inserted into said second inlet port.

34. Implantable infusion apparatus comprising a rigid manifold having opposite first and second surfaces and a pronounced outwardly projecting mesa positioned at or near the center of said second surface away from the periphery thereof, said mesa having a central perpendicular axis;

a collapsible fluid-tight infusate chamber having a closed end and an open end;

means for mounting the chamber open end in a fluid-tight manner to the manifold first surface opposite said mesa;

a self-sealing inlet port in said manifold mesa, said inlet port being accessible from the manifold second surface at the top of said mesa; fluid conduit means extending between said inlet port and the interior of said chamber; and

a first outlet conduit communicating between said manifold first surface inside said chamber and the manifold periphery.

4,978,338

**19**

35. Implantable infusion apparatus comprising
a rigid manifold having opposite first and second surfaces and a central mesa at said second surface, said mesa having a central perpendicular axis;
a collapsible fluid-tight infusate chamber having a closed end and an open end;
means for mounting the chamber open end in a fluid-tight manner to the manifold first surface opposite said mesa;
a self-sealing inlet port in said manifold mesa, said inlet port being accessible from the header second surface at the top of said mesa;
fluid conduit means extending between said inlet port and the interior of said chamber;
a first outlet conduit communicating between said manifold first surface inside said chamber and the manifold periphery;
a second self-sealing inlet port in said manifold mesa, said second inlet port being in alignment along said axis with said first inlet port and accessible from the manifold second surface at the top of said mesa; and
a second outlet conduit in said manifold communicating between said second inlet port and the periphery of said manifold.

36. The apparatus defined in claim 35 wherein first and second outlet conduits join in said manifold to form a Y-conduit that has a single outlet at the periphery of the manifold and which receives fluid from both said chamber and second inlet port.

37. The apparatus defined in claim 36 and further including a check valve in said Y-conduit downstream from the joint with said first outlet conduit to prevent fluid back flow into said second inlet port.

38. The apparatus defined in claim 37 and further including a fluid flow restrictor in said Y-conduit upstream from the joint with said second outlet conduit.

39. The apparatus defined in claim 38 wherein said Y-conduit includes
A. a first manifold passage extending into said chamber;
B. a second manifold passage extending into the manifold from the periphery thereof; and
C. a flow-restricting glass capillary tube wound around said mesa and connected between said first and second passages.

40. The apparatus defined in claim 35

**20**

A. wherein first and second outlet conduits have separate outlets located adjacent to the periphery of said manifold; and
B. further including first and second catheters having corresponding first ends connected to said first and second conduits respectively.

41. The apparatus defined in claim 35 and further including a dual-lumen catheter having a first end connected to the periphery of said manifold, the two lumens of said catheter being in fluid communication with different ones of said outlet conduits.

42. The apparatus defined in claim 35
A. wherein said first outlet conduit branches to form a Y-conduit that has first and second outlets at spaced-apart locations on the periphery of said manifold; and
B. further including a pair of catheters having corresponding first ends connected to said header periphery and being in fluid communication with said first and second outlets respectively; a first check valve connected between said second outlet conduit and one branch of said Y-conduit, and a second check valve connected between said second outlet conduit and the other branch of said Y-conduit, both of said valves preventing back flow from the Y-conduit into said second conduit.

43. The apparatus defined in claim 42 and further including a flow restrictor in each branch of said Y-conduit upstream from the said check valve connected thereto.

44. The apparatus defined in claim 42 wherein said catheters are connected to the header so that they extend more or less tangentially from the apparatus.

45. The apparatus defined in claim 33 and further including
A. a smoothly contoured cup-like first shell mounted to said header first surface at the periphery thereof, said first shell defining with said header a first fluid-tight compartment that contains said infusate chamber; and
B. a second smoothly contoured annular shell covering said manifold second surface except that the access to said inlet ports, said second shell being connected to said manifold periphery and said mesa so that the second shell defines with said manifold a second fluid-tight compartment that overlies said first and second outlet conduits.

* * * * *

Exhibit

B

DIALOG(R)File 129:PHIND(Archival)
(c) 2000 PJB Publications, Ltd. All rts. reserv.

00555240
Arrow aims a shot at infusion pump leader
   Clinica 778 p13, October 09, 1997 (19971009)
   STORY TYPE: F  WORD COUNT: 523

   *Arrow* *International* is positioning itself for head-on competition
against industry giant Medtronic in the $100 million market for
implantable infusion pumps in both the specialists' office and the
patent courts, according to Arrow's CEO and President Marlin
Miller.
Arrow , with sales of $229.9 million last year, specialises in a
broad range of clinically advanced disposable catheters and
related products, entered the infusion pump business in 1995 with
the purchase of *Therex*. In July, Arrow completed the purchase of
Pfizer's Strato/Infusaid implantable infusion pump business.
Mr Miller acknowledges that Medtronic dominates infusion pump
sales. "We are the only alternative to Medtronic, it gives us a
growth position," he told the third annual UBS Securities Life
Science conference in New York.
The FDA has approved the use of Arrow's Model 3000 constant flow
implantable infusion pump to treat benign pain with morphine.
Arrow was already marketing the pump to treat liver cancer with
the chemotherapy drug FUDR and the treatment of malignant pain
with morphine.
Medtronic has estimated that only 15 per cent of the potential
market for infusion pumps has been penetrated. Currently 40% of
the market is in chronic pain management and another 40% in
baclofen, used to control spasticity. Medtronic has the exclusive
licence to use baclofen until January 1. Arrow expects to offer
the drug in its own pump sometime next year.
"Other drugs are coming on the market that could be very
effectively delivered through implanted infusion pumps," Mr Miller
said. "This is a really interesting expanding market with fairly
lengthy room for two companies."
. . . several advantages
Arrow contends that its line of pumps offer several advantages
over the programmable pumps sold by Medtronic. The Model 3000 is
smaller than the Medtronic line but its drug reservoir has a
larger capacity. The Arrow model runs on rechargeable batteries.

Medtronic's batteries last three to five years and the process of
replacing them is costly.

In some cases the Medtronic pump is being replaced with an Arrow
model, Mr Miller said. The Arrow models deliver a constant amount
of the same drug which many doctors say is a lot more convenient
than a programmable pump once a patient is at the proper dose. To
further compete, Arrow sells its pump for $5,000, Medtronic for
$8,000.

Medtronic has recognised the advantages of a constant dose pump in
many circumstances and has begun clinical trials in the United
States for a model made by the German company, Tricumed
Medizintechnik.

Recently Arrow complained to Medtronic that the new German pump
violates its existing patent on the system in both Germany and the
US. Since Medtronic was not responded so Arrow is prepared to sue
for patent infringement. This could slow the introduction of the
product to Arrow's advantage, said Mr Miller.

While Arrow is moving on infusion pumps, its number one research
priority remains the future-looking Left Ventricular Assist
Device, intended to provide long-term cardiac assist to people
with end-stage congestive heart failure who are not good
candidates for a heart transplant (primarily people over age 65.
Mr Miller said Arrow intends to begin international clinical
trials next year and US clinical trials in 1999

# DE BRAUW BLACKSTONE WESTBROEK
Advocaten Notarissen Belastingadviseurs

## LINKLATERS
## & ALLIANCE

Tripolis 300  Burgerweeshuispad 301
Postbus 75084  1070 AB  Amsterdam

Telefoon: (020) 5 771 771
Telefax:  (020) 5 771 775

**2 2 MRT 2000**

**AANGETEKEND MET BERICHT VAN ONTVANGST**

Medtronic B.V.
Wenckebachstraat 10
6466 NC  KERKRADE

Prof. Willem A. Hoyng
Telephone:    31 - 20 5771777
Facsimile:    31 - 20 5771631
E-mail:      wahoyng@dbbw.nl

Amsterdam, 21 March 2000
Your ref.:
Our ref.:    f:\263\therex\b004.doc\lvB

Dear Sirs,

**Re:  Therex/Medtronic**

Therex Limited Partnership has asked my assistance in the abovementioned matter. As you know my client has started proceedings in the District Court of Düsseldorf in order to obtain a decision about the infringement of my client's European patent no. 0612535 B1. The court of Düsseldorf has been chosen as it is one of the courts in Europe with the best reputation in patent matters. The court has ruled that your client is indeed infringing upon my clients European patent. Furthermore the Opposition Division of the European Patent Office has rejected the lodged oppositions.

Contrary to the expectation of my client these decisions have not lead to the cessation of the infringing activities in the designated countries. On the contrary my client has noted that you have launched a so-called Belgian Torpedo in an apparent attempt to be able to continue the infringing activities. From the

De Brauw Blackstone Westbroek N.V. is gevestigd te Den Haag en ingeschreven in het handelsregister onder nr. 27171912; kwaliteitsrekening notarissen ABN AMRO Bank
nr. 50.34.36.720.

Alle diensten en (andere) werkzaamheden worden verricht uit hoofde van een overeenkomst van opdracht met De Brauw Blackstone Westbroek N.V. Op de overeenkomst
zijn de Algemene Voorwaarden van toepassing, die zijn gedeponeerd ter griffie van de rechtbank te Den Haag en waarin onder meer een beperking van de
aansprakelijkheid is opgenomen.

De deelnemende kantoren van Linklaters & Alliance zijn: De Brauw Blackstone Westbroek; De Bandt, van Hecke, Lagae & Loesch; Gianni, Origoni & Partners; Lagerlöf & Leman; Linklaters;
Oppenhoff & Rädler; met vestigingen te: Alicante  Amsterdam  Antwerpen  Bangkok  Berlijn  Brussel  Frankfurt  Göteborg  Den Haag  Hong Kong  Kauten  Leipzig  Londen  Luxemburg
Madrid  Malmö  Milaan  Moskou  München  New York  Parijs  Praag  Rome  Rotterdam  São Paulo  Shanghai  Singapore  St. Petersburg  Stockholm  Tokyo  Warschau  Washington DC.

DE BRAUW BLACKSTONE WESTBROEK

writ of summons in the Belgian proceedings my client has learned the acknowledgement that all infringing products are produced at your facilities at Kerkrade.

Your legal advisors must have informed you that my client has an urgent interest (certainly) after the decision of the Opposition Division to obtain a preliminary injunction to put to an end to the (willful) infringement in The Netherlands. The Belgian Torpedo is apparently designed to avoid such preliminary injunction. This is to inform you that my client is of the opinion that the Belgian court in both proceedings you have initiated has no jurisdiction with respect to other countries than Belgium. With respect to the preliminary injunction proceedings which you started in Belgium client accepts that there is an urgent interest for a decision of course - as the court has no jurisdiction for the other countries - to Belgium. My client will in the preliminary injunction proceedings file a cross complaint for an injunction for Belgium. Only in case the Belgian court would accept jurisdiction for the countries outside Belgium in the principal case my client - which in our view would be wrong - will also ask the Belgian court to grant a preliminary injunction for other countries than Belgium.

This is to inform you that if the Belgian court refuses jurisdiction or for any other reason no preliminary relief for The Netherlands will be obtained my client reserves the right to file for such relief in the District Court of The Hague. Although my client was planning to ask for such relief around the time the Belgian Torpedo was launched, my client now will therefor first await the outcome of the Belgian preliminary injunction proceedings in first instance as my client has understoond that a decision is to be expected in June. You will appreciate that this waiting period is caused by you choosing to institute proceedings in Belgium and that such waiting period is not taking away the urgency which my client according to Dutch law has with respect to preliminary relief in The Netherlands. You should also be aware of the fact that my client accepts this waiting period because if the Belgian court would grant relief for The Netherlands before the end of June no purpose is served to burden the Dutch court and parties with preliminary injunction proceedings in The Netherlands.

In order to avoid any misunderstanding I repeat that my client could start preliminary injunction proceedings and is entitled to a preliminary injunction for the Netherlands at any time but will only start such proceedings and seek such injunction if before June 30, 1999 the Court in Brussels has not granted such injunction.

Finally: if you are willing to accept that the court in Brussels has no jurisdiction for (among other countries) The Netherlands or for any other reason want the President of the Court of The Hague to deal with the question whether or not my client is entitled to a preliminary injunction for The Netherlands, my client is gladly prepared to ask the President for a date for a hearing during the coming weeks convenient to both parties.

You receive this letter by registered and ordinary mail.

Very truly yours,

Willem A. Hoyng

2